NEW ORLEANS AND
CARROLLTON RAIL-
ROAD CO.
*v.*
BOSWORTH, LILES,
ET AL.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## BENJAMIN LEE *v.* WILLIAM WHITEHEAD.

Simulated sale annulled.

The prescription of one year, established against certain real contracts, does not apply to those that are simulated.

<div align="right">
8    81
50  1239
</div>

APPEAL from the District Court, Fourth District, Parish of West Feliciana, *Perkins*, J. *Stockton* and *Steele*, for defendant.

ROST, J. The plaintiff has enjoined the sale of certain slaves, seized at the suit of the defendant against *Nicholas Barnes*, and claims title to them under judicial sales made in other suits against *Barnes*.

The defendant admits the existence of the title alleged, but avers that it is a simulation, devised by *Lee* and *Barnes* for the purpose of defeating the pursuit of the creditors of the latter, and that the name of *Lee* is merely used therein to cast a shadow upon the title of *Barnes*, which, in truth, has remained unchanged after the judicial sales. The District Court perpetuated the injunction, and the defendant has appealed.

Several questions have been raised in argument which it is not necessary to notice in detail. There is no legal evidence that the exception taken by the plaintiff, during the trial, was acted upon by the Court, or that he excepted to any of the testimony offered by the defendant in support of the issue of simulation, and it clearly results from the evidence which he himself introduced, and the admissions which he required the defendant to make, that the case was tried on that issue.

We deem it, also, unnecessary to take into consideration the informalities of the judicial sales, alleged as grounds of nullity by the defendant's counsel. He avers in his answer that the sales were made not only with the consent of *Barnes*, but by his procurement; they must, therefore, be considered as his acts, without regard to the form pursued and the informalities which, under a different state of facts, might perhaps affect their validity.

Under three executions issued in suits against *Barnes*, the slaves in controversy, with others, and a large body of land, partly in cultivation, were seized and adjudged by the Sheriff to the plaintiff for the sum of two thousand five hundred dollars, subject to the mortgages mentioned in the certificate of the Recorder, read at the sale, which amounted to upwards of sixty thousand dollars. Two days after the sale, which took place in the month of April, 1841, *Lee*, the purchaser, gave *Barnes* a power of Attorney to manage and administer the property sold. *Barnes* continued alone in possession until the fall of the year, when *Lee* came from the State of Mississippi with his family, and lived on

11

the place during more than one year. Early in 1843 he gave another power of attorney to *Barnes*, authorizing him not only to administer, but also to sell and mortgage the property. He then returned to the State of Mississippi, and had never been seen on the place again until he made the affidavit on which the injunction in this case issued, in April, 1851.

The defendant admitted before the trial, for the purpose of avoiding a continuance, that if an absent witness for the plaintiff was present, he would testify that *Lee* took possession of all the property purchased by him, and remained in actual possession thereof for more than a year, when he left on account of ill-health and the dissatisfaction of his family, and that during the time he was on the place he exercised all the rights of ownership over the property, and no other person exercised any rights of ownership during that time.

Two other witnesses, relatives of *Lee* and *Barnes*, also testified to the residence of *Lee* upon the place during more than one year, and that he exercised the rights of ownership during that time. It is proved that at least six months elapsed after the sale, before *Lee* came to live upon the plantation, and that *Barnes* continued to reside there after he came. Admitting the statement that *Lee* exercised the rights of ownership while he remained, to be true, it is insufficient to do away the presumption of simulation, resulting from the facts that the seller remained alone in possession during the six months which followed the sale, and that he has had sole control of the property since the departure of *Lee*. That presumption rests on motives of morality and public policy, and after it once attaches, it cannot be removed by so easy an expedient as the temporary residence of the purchaser on the premises sold. The parties must, in all such cases, produce proof that they are acting in good faith, and establish affirmatively the reality of the sale. C. C. 2456 and 1915.

The Court is unanimously of opinion that the plaintiff has failed to make that proof, and that the judgment rendered in his favor is clearly contrary to evidence.

One of the facts admitted by the defendant to prevent a continuance, was that the absent witness of the plaintiff would, if present, testify that *Lee* had the means to pay the two thousand five hundred dollars, for which the property was adjudicated to him; but there is no proof that he made the payment out of those means, and it is shown on the other side that *Barnes* had at the time, in the hands of his factor in New Orleans, two thousand seven hundred dollars, of which no account is given. Suffering his lands and slaves to be sold when he had on hand a sum larger than the amount they brought, is a course of conduct so unusual and inexplicable, that we cannot bring our minds to believe that he would have resorted to it, if the sale had been intended to be serious. The only rational explanation of which it is susceptible is, that *Barnes*, finding himself hopelessly insolvent, attempted in that manner to defeat the claims of a portion of his creditors, by placing his property in the hands of a third person, who would hold it for his benefit, subject only to the mortgages anterior in date to those under which it was sold—presumptions of that kind are authorized in cases of insolvency.

It is urged that the mortgages to which the property was subject have since been paid by *Lee;* but there is no evidence that he had any means to pay them beyond the property which he purchased; and no inference favorable to the good faith and reality of the transaction can be drawn from the fact that this property and its fruits have been applied to the payment of the mortgages, while, on the other hand, the unquestionable fact that some of those mortgages

have been satisfied out of other means of *Barnes*, satisfactorily shows that the release of those incumbrances were to inure to his benefit. What interest had he otherwise to apply his own means to pay mortgages for which the property sold was bound in the hands of the purchaser, and how could he do so, in good conscience, when those means were the common pledge of his unprotected creditors?

It has not escaped the attention of the Court that all those payments were made by *Barnes*, as agent of *Lee*, and while *Lee* resided in another State, at a distance of about two hundred miles. We must presume that he ordered them to be made, or was at least duly advised of them by his agent; but he has not seen fit to lay before us a line or a word of the correspondence which must necessarily have passed between them, if the sale was real.

In 1844, *Barnes*, pretending to act as agent, exchanged a tract of land for another belonging to *Mrs. Demos*, who agreed to pay him $10,000, for the difference in value. *Barnes* not only acted without authority in making that exchange —the power of attorney only authorizing him to sell or mortgage—but he forgot on that occasion the limits of the paper title of his principal, and sold as agent lands which were his own, and to which *Lee* had no claim.

In 1845 he pointed out to the U. S. Marshal, as his own, part of the Bushy bayou plantation, purchased by *Lee*. The land was seized and sold to satisfy a judgment against *Barnes*.

In 1847 the Legislature granted to *Barnes*, the agent of *Lee*, the privilege of keeping a ferry, which he has kept ever since.

These acts of the agent were all of such a nature as to require explanation; the pointing out the property of his principal as his own, and causing it to be sold, was a fraud with which no owner of property would put up; yet so far as the record shows, *Lee* never complained, and his confidence in his unfaithful agent has remained unabated to this day.

There are other facts in the record leading to the same conclusion, but we have said enough to show that the plaintiff has failed to establish his good faith and the reality of the sale, as under the facts of the case he was bound to do. Having come to the conclusion that the title of *Barnes* was not divested by the Sheriff's sales, it is clear that prescription of one year cannot be invoked by the plaintiff. That prescription only applies to real contracts—this case is hardly distinguishable from that of *Erwin* v. *The Bank of Kentucky*, 5 Ann., page 1.

The judgment of the defendant against *Barnes* bearing interest at the rate of ten per cent. per annum, no further interest can be allowed on the dissolution of the injunction.

It is ordered that the judgment be reversed.

It is further ordered that the injunction be dissolved, and the defendant be allowed to proceed under his execution.

It is further ordered that the defendant recover from the plaintiff and *Richard Featherston*, his surety on the injunction bond, *in solido*, the sum of two hundred and fifty dollars damages.

It is further ordered that plaintiffs pay costs in both Courts.